**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

DENISE KRYKEWYCZ,                )
                                 )
                    Plaintiff,   )
                                 )
            v.                   )      C.A. NO. 17-821-RGA-MPT
                                 )
NANCY A. BERRYHILL,              )
Acting Commissioner of           )
Social Security,                 )
                                 )
                    Defendant    )
                                 )


**REPORT AND RECOMMENDATION**

**I.      INTRODUCTION**

        This action arises from the denial of Plaintiff's claim for Social Security benefits.

On August 24, 2012, Plaintiff filed an application for Social Security Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of

the Social Security Act (the "Act").[1]  In her initial application and disability report, Plaintiff

alleged she became disabled on November 1, 2002 due to several physical

impairments, including arthritis, gout, bursitis, and heart problems.[2]  Her claims were

denied initially on March 16, 2013, and denied again upon reconsideration on June 9,

2013.[3]  On August 9, 2013, Plaintiff filed a request for a hearing before an

Administrative Law Judge ("ALJ").[4]  Subsequently, the ALJ dismissed her request since

---

[1] D.I. 7 at 1615.
[2] D.I. 4-7 at 336.
[3] D.I. 4-3 at 120, 143.
[4] *Id.* at 160.

Plaintiff did not appear for the scheduled hearing.[5]  Plaintiff then filed a request for review of the dismissal, and on December 17, 2014, the Appeals Council vacated the dismissal and remanded the case to the ALJ.[6]  The remanded claim was heard on April 1, 2015 before ALJ William Kurlander.[7]  At the hearing, testimony was provided by Plaintiff and a vocational expert, Christina Cody (hereinafter referred to as "Cody").[8]  The ALJ found that Plaintiff did not qualify as "disabled" under either act and denied her request for benefits in a decision dated December 18, 2015.[9]  Following the ALJ's unfavorable decision, Plaintiff filed a request for review, which the Appeals Council subsequently denied.[10]  She then filed a timely appeal with this court on January 15, 2016.[11]  Presently before the court are the parties' cross motions for summary judgment.  For the reasons that follow, it is recommended that Defendant's motion be granted.

## II.   BACKGROUND

Plaintiff was born on August 30, 1956.[12]  She has a high school education and past work experience as a telemarketer.[13]  She was 46-years-old at the onset of her alleged disability, which dates from November 1, 2002.[14]  In 2012, she reported to the

---

[5] *Id.*
[6] *Id.* at 164.
[7] D.I. 4-2 at 36.
[8] *Id.*
[9] *Id.* at 47.
[10] *Id.* at 19.
[11] *Id.* at 26.
[12] *Id.* at 63.
[13] *Id.* at 64-65.
[14] *Id.* at 58.

state agency that she stopped working in 2002 due to multiple physical impairments.[15] However, Plaintiff was incarcerated from 2002-2005 after being convicted of corrupting the morals of a minor.[16]

On her initial disability report in 2012, Plaintiff stated she was unable to work due to her physical impairments including arthritis, gout, bursitis, and heart problems.[17]  In 2013, she alleged no additional impairments at reconsideration.[18]  However, in 2015, Plaintiff testified that she remained unable to work due to the physical problems, as well as, psychological problems.[19]  While incarcerated, Plaintiff was prescribed medication for depression and anxiety.[20]  In 2015, her therapist diagnosed acute stress and personality disorder.[21]  Additionally, while in prison, Plaintiff reported neck, back, foot and hand pain.[22]  In 2013, she initially sought treatment with a rheumatologist for reported pain in her joints and back.[23]  She underwent shoulder surgery for a rotator cuff tear in 2014.[24] Plaintiff also has reoccurring issues with kidney stones and kidney stone disease, urinary tract infections, and urinary incontinence, for which she underwent surgery in 2010.[25]  Despite her prior vocational experience, Plaintiff claims she remains disabled under the Acts.[26]  To be eligible, Plaintiff must demonstrate she is disabled

---

[15] D.I. 4-7 at 337.
[16] D.I. 4-2 at 66-67.
[17] *Id.* at 41.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 42.
[21] D.I. 4-19 at 1390.
[22] D.I. 4-2 at 42.
[23] *Id.*
[24] *Id.*
[25] D.I. 4-10 at 512-22.
[26] D.I. 4-2 at 90.

within the Acts, which have the same standard, as discussed below.

### A. Evidence Presented

Plaintiff allegedly suffers from a myriad of issues, the combination of which is her basis that she is unable to perform any substantial gainful activity. Plaintiff provided records of extensive treatment notes from the prison infirmary where she complained of various issues during her 4-year incarceration.[27] Plaintiff had minimal consistent treatment after her release in 2005. According to the record, Plaintiff complains of various impairments on which she bases her claim; however, as noted by the ALJ, the record lacks objective medical findings to support her assertions.[28]

#### 1. Physical Impairments

While incarcerated, Plaintiff was treated at the prison infirmary for complaints including boils, colds, gynecological issues and injuries from alleged assaults by other inmates.[29] In January 2003, she reported pain in her left foot from a prior surgery, but received no ongoing treatment.[30] In August of that year, she complained of pain in her right foot from a bunion.[31]

In July 2003, Plaintiff first reported pain in her neck and back from an alleged prior injury.[32] In May 2004, she again complained of neck and back pain. The nurse practitioner, however, noted Plaintiff "may be malingering" because she was able to

---

[27] D.I. 4-2 at 42.
[28] *Id.*
[29] *Id.*
[30] D.I. 4-17 at 1162.
[31] D.I. 4-16 at 1045.
[32] *Id.* at 1055.

4

"stand and do a dance" after being upset about not getting her requested treatment.[33] In 2005, she complained of hand pain, then later of pain in her left knee.  X-rays of these areas were normal.[34]

Following her release from prison, she followed up with a breast specialist for mammograms for cysts in her left breast.[35]  In 2007, she had genetic testing that revealed no mutation.[36]  Plaintiff underwent an excision of a mass on her left chest wall in 2011.[37]  As noted by the ALJ, there is no additional documentation of any further breast surgery, contrary to her claims that she had a mastectomy and surgical removal of her milk glands.[38]

In 2013, Plaintiff started with a rheumatologist for pain in her joints and back.[39] She was prescribed Prednisone and Neurontin for osteoarthritis and inflammatory polyarthropathy.[40]  A spinal MRI revealed mild disc joint degeneration with no nerve root involvement.[41]  X-rays showed mild facet arthritis, normal sacroiliac joints, degeneration in the hands and normal knees.[42]  Examination findings from 2013 through 2014 revealed no joint swelling and normal motor function.[43]  Despite Plaintiff's complaints of disabling back and joint pain, she has not returned to her rheumatologist since 2014,

---

[33] D.I. 4-18 at 1265.
[34] D.I. 4-19 at 1328-42.
[35] D.I. 4-2 at 42.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.* at 44.
[42] *Id.*
[43] *Id.* at 42.

nor has she sought an evaluation with an orthopedist or surgeon for her back.[44]

Plaintiff saw a pulmonologist in 2013 for shortness of breath and coughing, which was treated with Flonase and attributed to allergies after a normal pulmonary function test and chest x-ray.[45] A sleep study revealed mild obstructive sleep apnea and a CPAP machine was recommended, but Plaintiff did not want it prescribed.[46] Thus, the records lack support for Plaintiff's testimony that she falls asleep due to her "heart condition."[47]

In June 2014, Plaintiff underwent arthroscopic surgery on the right shoulder to repair her rotator cuff.[48] By September, despite her complaint of continuing pain, test results showed full strength in the shoulder and right upper extremity.[49] She was advised to continue activities as tolerated with no specific restrictions.[50]

In March 2015, Steven Manifold, M.D. completed an RFC questionnaire, particularly relevant since Plaintiff claims the ALJ erred by giving the report little weight in his RFC determination.[51] The questionnaire indicated that Plaintiff:

> could sit, stand and walk eight hours each day and that she could lift and carry up to 24 pounds occasionally, 19 pounds frequently, and 9 pounds continuously . . . [and] occasionally push or pull arm controls with her right hand and occasionally reach. [Plaintiff] has no limitations on bending and squatting, but could only occasionally climb, push, pull or crawl.[52]

---

[44] *Id.* at 45.
[45] D.I. 4-2 at 43.
[46] *Id.*
[47] *Id.*
[48] *Id.* at 43.
[49] D.I. 4-20 at 1394-97.
[50] *Id.*
[51] D.I. 4-19 at 1385-86.
[52] D.I. 4-2 at 46.

The last documented office visit occurred in December 2014, three months before Dr. Manifold completed the questionnaire.[53]  At that time, Plaintiff had normal strength in her right upper extremity and had no activity restrictions.[54]

### 2. Mental Impairments

Documentation in the record regarding mental status findings or treatment is minimal. Plaintiff was evaluated by a psychiatrist prior to her sentencing in 2000.[55]  The doctor concluded that Plaintiff suffered from and needed treatment for Major Depressive Disorder, Inadequate Personality Disorder, and Post Traumatic Stress Disorder related to her seeing a dead body in 1997.[56]  He also opined that she was a high risk for suicide completion.[57]

While incarcerated, Plaintiff was treated with Prozac and Vistaril for depression and anxiety, although few symptoms or mental status findings are documented in the prison medical records.[58]  Moreover, the prison records are highly inconsistent regarding her mental impairments.  Plaintiff's self-reported "current problems" and the medical history fluctuated greatly during her four year incarceration and included a variety of undiagnosed psychological disorders.[59]

Plaintiff started seeing therapist Laura Wechsler L.D.C.S.W. in March 2010.[60]  Ms. Wechsler's session notes provide little support evidencing any mental impairments.

---

[53] *Id.*
[54] *Id.*
[55] D.I. 4-2 at 43.
[56] D.I. 4-19 at 1365-6.
[57] *Id.* at 1366.
[58] D.I. 4-2 at 43.
[59] *See generally* D.I. 4-15.
[60] D.I. 4-2 at 43.

The notes are very emotional and relate more to Ms. Wechsler's belief that Plaintiff was wrongly convicted of a felony than her purported psychological issues.[61] Few symptoms and no mental status findings are documented. There is no indication how Plaintiff's mental impairments were addressed and no record of Ms. Wechsler treating Plaintiff after 2012.[62]

In 2015, Ms. Wechsler completed a Diagnosis and Mental Residual Functional Capacity Form in which she reported that Plaintiff's diagnoses are acute stress disorder and personality disorder not otherwise specified.[63] She also completed a questionnaire regarding Plaintiff's ability to perform work activities and limitations to her potential work performance.[64]

The questionnaire indicated that Plaintiff:

> is not precluded from understanding, remembering, and carrying out simple instructions, maintaining attention for two-hour periods, sustaining an ordinary routine, and interacting appropriately with the general public, but that she is limited in working with detailed tasks. . . . [Plaintiff's] job performance is precluded 10-15% of the workday in such areas as performing activities within a schedule and maintaining regular attendance, working in coordination with others, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instruction and responding appropriately to criticism from supervisors, getting along with co-workers or peers, and responding appropriately to changes in the work setting.[65]

Plaintiff contends that the ALJ's decision to reject the part Ms. Wechsler's assessment about her limitations is error.[66]

---

[61] *See* D.I. 4-21 at 1495-1504.
[62] *Id.*
[63] D.I. 4-19 at 1387-90.
[64] *Id.*
[65] D.I. 4-2 at 44.
[66] *Id.* at 29.

The only other record regarding Plaintiff's alleged mental impairments is a discharge summary from Dover Behavioral Health in November 2012.[67]  Plaintiff testified that she was hospitalized after a suicide attempt and "lived" there for awhile.[68] According to the records, she was hospitalized for one week, followed by outpatient treatment for "stress management" through the end of the month.[69]  The discharge records contain no diagnosis, no reported symptoms, no mental status findings nor Plaintiff's functional status.[70]

### 3.    State Agency Assessment

After Plaintiff filed her initial disability report in 2012, the Agency concluded she was not disabled.[71]  An assessment of Plaintiff's impairments in the Disability Determination Explanation is dated March 16, 2013.[72]  The Agency found Plaintiff had some limitations in the performance of certain work activities, but that Plaintiff had the RFC to perform her past relevant work as a telemarketer.[73]

Moreover, consistent with the ALJ's findings, the Agency concluded that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not sustained by the objective medical evidence alone, and determined Plaintiff was capable of performing light work, noting her ability to perform personal care, do light cooking, household chores, shop, and socialize with family.[74]

---

[67] D.I. 4-19 at 1367-71.
[68] D.I. 4-2 at 85.
[69] Id. at 44.
[70] Id.
[71] See generally D.I. 4-3 at 109-121.
[72] Id.
[73] D.I. 4-3 at 119.
[74] Id. at 117, 151.

The Agency also completed an RFC assessment, which concluded Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and could stand or walk with normal breaks for 6 hours during an 8 hour work day.[75] She did not have any exertional limitations in pushing and/or pulling.[76]

The Agency did not complete a mental assessment for Plaintiff because the evidence was insufficient to establish a mental impairment at that time.[77] In fact, the report noted that Plaintiff did not allege any impairment related to any mental condition.[78] Further, she denied treatment for any mental or emotional condition and reported that her condition did not affect her mental facilities.[79]

### B.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the hearing on April 1, 2015, Plaintiff testified to her background, criminal charges, work history, and alleged disability.[80] Concerning her daily activities, Plaintiff claimed to have no friends or social life.[81] She lives with her husband, who works full-time, and her 27 year-old son who is unemployed and suffers from agoraphobia.[82] Plaintiff cooks dinner for her son, but testified her husband is the one who takes care of him.[83] Plaintiff cares for one dog and twenty cats that she rescued.[84] Her son helps her

---

[75] *Id.* at 130.
[76] *Id.*
[77] D.I. 4-2 at 46.
[78] D.I. 4-3 at 115.
[79] *Id.*
[80] *See generally* D.I. 4-2 at 58-91.
[81] D.I. 4-2 at 88.
[82] *Id.* at 64.
[83] *Id.* at 64, 88.
[84] *Id.* at 73.

feed the cats and her husband helps with cleaning the litter boxes.[85]  Although her husband does most of the driving, she sometimes drives to the grocery store where she uses a motorized cart when shopping.[86]

Plaintiff last worked in 2002 at A&S Enclosures as a supervisor in the telemarketing room.[87]  Although she admitted that she stopped working because she was sent to prison, she also testified that she would have quit anyway because of an issue she had with her supervisor.[88]  Moreover, she claimed that since being incarcerated she could not have performed her past work as a telemarketer as she does not "want to talk to people" and does not "want to do it anymore" because of the stress related to her felony conviction.[89]  Additionally, Plaintiff testified that, absent her incarceration, she was unable to work between 2002-2005 because any physical movement was difficult, due to a bulging cartilage between two vertebrae in her spine as a result of multiple motor vehicle accidents.[90]  She denied returning to work light duty in July 2010 despite the record from Delaware Valley Urology.[91]

The primary basis for her disability claim is the severity of her psychological impairments.[92]  These problems arose in 2000 when she was originally incarcerated for her conviction of corrupting the morals of a minor, which resulted in prison time of over

---

[85] *Id.* at 74, 88.
[86] *Id.* at 70-71.
[87] *Id.* at 65.
[88] *Id.*
[89] *Id.* at 90-91.
[90] *Id.* at 66.
[91] *Id.* at 75.
[92] *Id.* at 105.

three years and she is now a registered sex offender.[93]  She maintained her innocence throughout and believes that the jury was prejudiced against her.[94]  Plaintiff claims she was assaulted by her Parole Officer, by guards, and by inmates while in prison.[95]  She saw a psychiatrist once a week while incarcerated.[96]

Plaintiff saw her therapist, Ms. Wechsler, from 2006-2010.[97]  She purportedly maintains contact with Ms. Wechsler via phone calls four to six times a month, but no longer attends therapy sessions.[98]  Plaintiff alleged she was hospitalized on November 1, 2012 for attempted suicide and subsequently ended up "living at Dover Behavioral for a couple of months."[99]

Plaintiff testified regarding her difficulty with focusing and concentration that has persisted since 2002.[100]  She is unable to read or watch television without falling asleep, which she attributes to a heart condition.[101]  However, the ALJ noted such testimony was inconsistent with the good recall she demonstrated during the hearing.  Plaintiff remembered dates and names, was aware of recent news stories, and remained alert throughout the hearing.[102]

Regarding her physical impairments, Plaintiff alleged that she uses a cane to

---

[93] *Id.* at 62-69.
[94] *Id.* at 69, 78.
[95] *Id.* at 73, 79, 83.
[96] *Id.* at 79.
[97] *Id.* at 81.
[98] *Id.* at 82.
[99] *Id.* at 85.
[100] *Id.* at 86.
[101] *Id.* at 86-87.
[102] *Id.*

walk and has done so for years, although the cane was not prescribed by a doctor.[103] She was diagnosed with breast cancer in 1998 and had related surgery the same year.[104]  She claims a recent biopsy was done on her left breast.[105]  Additionally, she testified that her milk glands were removed, which causes problems with raising her arms and weakness in her shoulder muscles.[106]  She underwent surgery for a torn rotator cuff that allegedly resulted from the assaults by guards and inmates while in prison.[107]  Her shoulder continues to cause significant pain, despite surgery.[108]  She also experiences extreme pain in her back from arthritis and bulging spinal cartilage.[109] Plaintiff has also been treated periodically for chronic bronchitis she experiences from previous exposure to mold.[110]

## 2.    *Vocational Expert Testimony*

During her testimony, the vocational expert, Cody, was asked to consider multiple questions involving a hypothetical individual of Plaintiff's age, education and work history.[111]  First, she was asked to assume that the individual was limited to work at the medium exertional level with the additional limitations of unskilled, reasoning level one or two, only occasional interaction with coworkers and supervisors, and no interaction with the general public.[112]  Although these limitations eliminate Plaintiff's past

---

[103] *Id.* at 70.
[104] *Id.* at 82.
[105] *Id.*
[106] *Id.* at 83.
[107] *Id.*
[108] *Id.* at 84.
[109] *Id.*
[110] *Id.* at 95.
[111] *Id.* at 92.
[112] *Id.* at 93.

work as a telemarketer, the ALJ inquired whether other positions were available that the hypothetical individual could perform.[113]  Cody testified that such jobs existed and provided examples of positions, along with the estimated numbers of such positions currently available in the national economy.[114] Examples included a hand packager with 228,300 positions available in the national market, an order picker which has 111,300 positions available, and a clean up worker with 157,500 positions.[115]

The next hypothetical included the same limitations, with the additional limitation of no exposed heights.[116]  Cody testified that the positions from the first hypothetical would remain feasible with this additional limitation and there would be no reduction in the number of available jobs.[117]  Additionally, none of these occupations would expose an individual to more than occasional atmospheric irritants such as dust, fumes, odors, and gases and would not effect the available positions.[118]

The ALJ then asked Cody to consider the same hypothetical individual, with all limitations of the first two hypothetical questions, plus the additional limitations of occasional overhead reaching, and light exertional level.[119]  Cody concluded that work was available for the individual with these limitations.[120]

Cody was further requested to consider the same hypothetical individual, but with severe psychological issues that would require a job involving no interaction with people

---

[113] *Id.*
[114] *Id.*
[115] *Id.14*
[116] *Id.*
[117] *Id.* at 94.
[118] *Id.* at 96.
[119] *Id.* at 94.
[120] *Id.*

80 percent of the time or more.[121]  Cody testified that there is not any competitive

employment available for such an individual.[122]  She confirmed, however, that only

occasional contact with coworkers or supervisors would not restrict any of the previously

listed jobs.[123]

Plaintiff's attorney argued that an employee does not choose when to interact

with her supervisor.[124]  He asked Cody if a supervisor wanted to interact with an

employee when that employee did not due to emotional problems, whether this situation

would effectively preclude previous jobs.[125]  Cody advised that this limitation would

preclude any work.[126]

Plaintiff's attorney then further questioned Cody in regard to the limitations from

Ms. Wechsler's psychological evaluation of Plaintiff.[127]  Specifically:

> [I]f we're dealing with an individual who at least 15 percent of the time could not
> perform activities within a schedule, maintain regular attendance and be punctual
> within customary tolerances 15 percent of the work day . . . And if we were to
> have the same degree of restriction, 15 percent or more where they could not
> work in coordination with or in proximity to others without being distracted by
> others would that interfere with that persons ability to do any of the jobs you
> indicated?[128]

Cody testified that such restrictions would reduce productivity making work

preclusive.[129]  She specifically noted that these restrictions would interfere with the

---

[121] *Id.* at 96.
[122] *Id.* at 97.
[123] *Id.*
[124] *Id.* at 98.
[125] *Id.*
[126] *Id.*
[127] *Id.* at 99.
[128] *Id.*
[129] *Id.*

individual's ability to perform Plaintiff's past work.[130]

**C. The ALJ's Finding of Facts and Conclusions of Law**

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2007.

2. Plaintiff has not engaged in substantial gainful employment activity since November 1, 2002, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*)

3. Plaintiff has the following severe impairments: osteoarthritis, inflammatory polyarthropathy, back pain, chronic pain syndrome, shoulder disorder, bursitis, anxiety, posttraumatic stress disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c))

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Plaintiff has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is limited to unskilled work.

6. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Plaintiff was born on August 30, 1956 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age and advanced age (20 CFR 404.1563 and 416.963).

8. Plaintiff has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

---

[130] *Id.*

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from November 1, 2002, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Conclusively, "[b]ased on the application for a period of disability and disability insurance benefits protectively filed on August 21, 2012, [Plaintiff] is not disabled under sections 216(I) and 223(d) of the Social Security Act." Furthermore, "[b]ased on the application for supplemental security income protectively filed on August 21, 2012, [Plaintiff] is not disabled under section 1614(a)(3)(A) of the Social Security Act."

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Both parties moved for summary judgment. In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[131] If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[132]

This standard does not change merely because there are cross-motions for summary judgment.[133] Cross-motions for summary judgment:

---

[131] *Reeves v. Sanderson Plumbing, Prods., Inc.,* 530 U.S. 133, 150 (2000).

[132] *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005)(quoting Fed. R. Civ. P. 56(c)).

[133] *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir. 1987).

are no more than a claim be each side that it alone is entitled to
summary judgment, and the making of such inherently contradictory
claims does not constitute and agreement that if one is rejected the
other necessarily justified or that the losing party waives judicial
consideration and determination whether genuine issues of material
fact exist.[134]

"The filing of cross-motions for summary judgment does not require the court to grant

summary judgment for either party."[135]


### B.    Court's Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision.  The court

may reverse the Commissioner's final determination only if the ALJ did not apply the

proper legal standards, or the record did not contain substantial evidence to support the

decision.  The Commissioner's factual findings are upheld if supported by substantial

evidence.[136]  Substantial evidence means less than a preponderance of the evidence,

but more than a mere scintilla of evidence.[137]  As the United States Supreme Court has

found, substantial evidence "does not mean a large or significant amount of evidence,

but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."[138]

In determining whether substantial evidence supports the Commissioner's

findings, the court may not undertake a *de novo* review of the decision nor may it re-

---

[134] *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968).
[135] *Krupa v. New Castle County,* 732 F. Supp. 497, 505 (D. Del. 1990).
[136] 42 U.S.C.  §§ 405(g), 1383(c)(3); *see also Monsour Medical Center v.
Hecklem,* 806 F.2d 1185, 1190 (3d Cir. 1986).
[137] *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005).
[138] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

weigh the evidence of record.[139]  The court's review is limited to the evidence that was

actually presented to the ALJ.[140]  The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence. Nor is evidence substantial if it is
> overwhelmed by other evidence, particularly certain types of
> evidence (e.g., evidence offered by treating physicians) or if it really
> constitutes not evidence but mere conclusion.[141]

Thus, the inquiry is not whether the court would have made the same

determination, but rather, whether the Commissioner's conclusion was reasonable.[142]

Even if the court would have decided the case differently, it must defer to the ALJ and

affirm the Commissioner's decision so long as the decision is supported by substantial

evidence.[143]

Where "review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the

agency in making its decision."[144]  In *Securities & Exchange Commission v. Chenery

Corp.*, the Court found that a "reviewing court, in dealing with a determination or

judgment which an administrative agency alone is authorized to make, must judge the

propriety of such action solely by the grounds invoked by the agency."[145]  "If those

grounds are inadequate or improper, the court is powerless to affirm the administrative

---

[139] *Monsour*, 806 F.2d at 1190.
[140] *Matthews v. Apfel,* 239 F.3d 589, 593-95 (3d Cir. 2001).
[141] *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983).
[142] *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 1988).
[143] *Monsour*, 806 F.2d at 1190-91.
[144] *Hansford v. Astrue,* 805 F.Supp. 2d 140, 144-45 (W.D.Pa 2011).
[145] *Sec. & Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 196 (1947).

action by substituting what it considers to be a more adequate or proper basis."[146]  The

Third Circuit has recognized the applicability of this finding in the Social Security

disability context.[147]  Accordingly, this court's review is limited to the four corners of the

ALJ's decision.[148]

## C.  ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to

assist "individuals who have attained the age of 65 or are blind or disabled" by setting a

minimum income level for qualified individuals.[149]  In order to establish SSI eligibility, a

claimant bears the burden of proving that she is unable to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of or not less than twelve months."[150]  Moreover, "the physical or

mental impairment or impairments must be of such severity that the claimant is not only

unable to do [her] previous work but cannot, considering [her] age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

significant numbers in the national economy."[151]  Furthermore, a "physical or mental

impairment" is an impairment that results from anatomical, physiological, or

psychological abnormalities which are evidenced by medically acceptable clinical and

---

[146] *Id.*

[147] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).

[148] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D.Pa 2005).

[149] *See Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982 ed.)).

[150] 42 U.S.C. § 423(d)(1)(A).

[151] 42 U.S.C. § 423(d)(2)(A).

laboratory diagnostic techniques.[152]

## 1.    Five-Step Test

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled.[153]

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If a claimant is found to be engaged in substantial activity, the disability claim will be denied.
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are 'severe', she is ineligible for disability benefits.  In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  The ALJ will often seek the assistance of a vocational expert at this fifth step.[154]

If the ALJ determines that a claimant is disabled at any step in the sequence, the

---

[152] 42 U.S.C. § 423(d)(3).

[153] *See* 20 C.F.R. §416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

[154] *Plummer*, 186 F.3d at 427.

analysis stops.[155]

## 2. Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[156]  Moreover, such reports will be given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[157]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[158]  If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[159]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion:  rather, it is an opinion on an issue reserved to the ALJ because it is a finding that is dispositive of the case.[160]  Therefore, only the ALJ can make a disability determination.

---

[155] *See* 20 C.F.R § 404.1520(a)
[156] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)
[157] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[158] *Morales v. Apfel*, 225 F.3d 310, 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).
[159] *Plummer*, 186 F.3d at 429.
[160] *See* 20 C.F.R. § 416.927 (e)(1).

### 3.     Evaluation of Subjective Accounts of Pain[161]

Statements about the symptoms[162] alone never establish the existence of any impairment or disability.  The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### 4.     Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms.  Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence and limiting effects of the symptoms on the claimant:  it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 CFR Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### 5.     Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  Therefore, he must determine the

---

[161] *See* 20 C.F.R §§ 416.928-29.  *See also* SSR 96-7p.

[162] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

applicant's credibility.[163]

At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians, psychiatrists and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect her activities of daily living and ability to work.[164]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue. Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i)  The applicant's account of daily activities;

(ii)  The location, duration, frequency, and intensity of pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v)  Treatment, other than medication, the applicant receives or has received for relief of pain or other symptoms;

(vi)  Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

---

[163] Credibility is the extent to which the statements can be believed and accepted as true.
[164] *See* 20 C.F.R. § 404.1529.

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[165]

### 6.　　Factors in Evaluating Credibility[166]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors, noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other

---

[165] *See* 20 C.F.R. § 404.1529
[166] *See* SSR 96-7p.

physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis. Such opinions are not given controlling weight. However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability. The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain, that is, provide sufficiently specific reasons based on the record, to the claimant and any subsequent reviewers, regarding the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[167]  A claimant's testimony is accorded substantial credibility when she has a long work history, if it is unlikely that, absent pain, she would have ended employment.[168]

### 7.    Medical Expert Testimony

The onset date of disability is determined from the medical records and reports

---

[167] *See* 20 C.F.R. § 404.1529(a)(3)

[168] *See Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981).  In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company.  He had a ninth grade education and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.

and other similar evidence, which requires the ALJ to apply informed judgment.[169]  At the hearing, the ALJ should call on the services of a medical advisor when onset must be inferred.[170]

## IV.    DISCUSSION

### A.    Parties' Contentions

Plaintiff maintains that the ALJ committed legal error in his determination of her residual functional capacity ("RFC") by failing to account for all of the functional limitations imposed by her impairments.[171]  The ALJ found that Plaintiff suffers from severe mental impairments and that she has moderate difficulties in concentration, persistence, or pace.[172]  However, Plaintiff argues, the ALJ then erred by placing no limitation on her ability to perform mental work activities.[173]  Although the ALJ did find Plaintiff was limited to unskilled work, Plaintiff argues this is a vocational factor, and not a mental limitation.[174]  Moreover, Plaintiff asserts that the ALJ's determination that she could do medium work is unsupported, and even contradicted, by all medical opinions in the record regarding her physical impairments.[175]  Plaintiff argues that the ALJ's RFC assessment of unskilled, medium work lacked the necessary support of medical opinion evidence, therefore making his decision legally defective.[176]

---

[169] *See* SSR 83-20.
[170] *Id.*
[171] D.I. 7 at 1615.
[172] D.I. 4-2 at 38-40.
[173] *Id.* at 1615-16.
[174] D.I. 7 at 1618.
[175] *Id.* at 1616.
[176] *Id.* at 1618.

Plaintiff further argues that in the presence of non-exertional limitations, the ALJ's reliance on the Medical-Vocational rules as a framework to find her not disabled is expressly prohibited by the Agency's regulations and Third Circuit precedent.[177]  Even assuming that the ALJ rejected all non-exertional limitations, Plaintiff contends the ALJ still erred by failing to properly explain this rejection, as is required by Circuit law.[178]

Alternatively, Defendant argues that substantial evidence supports the ALJ's decision.[179]  Defendant asserts that the ALJ's assessment of Plaintiff's RFC for medium work, his decision not to include additional limitations, and his use of the Medical-Vocational Rules as a framework, are all sufficiently supported by the evidence presented.[180]

Defendant contends that a limitation of unskilled work can adequately account for moderate limitations in concentration, persistence, or pace.[181]  Additionally, Defendant argues that under the Social Security Administration's ("SSA") current regulations, the ALJ is solely responsible for making the administrative finding regarding a claimant's RFC, based on the record evidence.[182]  Thus, Plaintiff's claim that the ALJ erred by failing to rely on medical opinion evidence in his RFC assessment is erroneous.[183]

---

[177] *Id.* at 1621.
[178] *Id.* at 1622.
[179] D.I. 9 at 1634.
[180] *Id.*
[181] *Id.* at 1640.
[182] *Id.* at 1644-45.
[183] *Id.*

## B.     Analysis - Appropriateness of the ALJ's Assessment

The issue determined by the ALJ was whether Plaintiff is disabled under sections 216(I), 223(d), and 1614(a)(3)(A).  The present issue for the court is whether the ALJ properly applied the legal standards in making the determination:  specifically, whether "substantial evidence" supports the ALJ's decision.[184]  If the substantial evidence standard cannot be found, then this court may reverse the Commissioner's final determination that Plaintiff is not disabled under the Acts.[185]

Plaintiff's overarching contentions are the following:  (1) The ALJ erred by failing to account in his RFC for all functional limitations stemming from her impairments, and (2) the ALJ improperly relied on the Agency's Medical-Vocational Rules.  Therefore, this court's decision is based upon whether the ALJ's analysis of the disability determination was reasoned in a manner meeting the required standards.[186]

### 1.     The ALJ's RFC Finding

Plaintiff alleges the ALJ's RFC is not supported by substantial evidence.  An RFC establishes the most an individual can do in a work setting despite impairments and limitations.[187]  In making this finding, the ALJ must consider all of the claimant's impairments, including those that are not severe.  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.[188]  Notwithstanding the fact that

---

[184] *See supra* part III (B).
[185] Id.
[186] *See supra* part III (C).
[187] 20 C.F.R. § 404.1545
[188] *See Plummer,* 186 F.3d at 429.

all evidence in the record must be considered, the ALJ has the exclusive responsibility for determining an individual's RFC.[189]

In the instant matter, the ALJ determined Plaintiff had the residual functional capacity to perform medium work, with a limitation of unskilled work.[190] The SSA defines work as "medium" when it "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."[191] Moreover, the SSA defines "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."

This court finds that the ALJ properly applied the correct standards under the Agency regulations, and substantial evidence supports the ALJ's decision. In determining Plaintiff's RFC, the ALJ considered all of her symptoms and the extent to which the symptoms could be considered consistent with the record evidence. Additionally, he considered all opinion evidence.[192] The ALJ properly considered the entire record and sufficiently explained in his decision the weight afforded to each source.

### 2.    Weight Accorded to Medical Opinion Evidence

Consistent with the regulations, the ALJ considered the record as a whole in assessing Plaintiff's RFC. Therefore, because the ALJ's decision is supported by substantial evidence, there was no error when determining Plaintiff's RFC by excluding

---

[189] 20 C.F.R. § 404.1527(d)(2)
[190] D.I. 4-2 at 41.
[191] 20 C.F.R. § 416.967(c)
[192] D.I. 4-2 at 41.

certain limitations based on her alleged impairments. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, he concluded that Plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible.[193] The ALJ proceeded to list all of Plaintiff's alleged symptoms and explained his reasoning for rejecting limitations based on said symptoms by referencing specific medical evidence in the record, or the lack thereof, as discussed below.

In support of his rejection of Plaintiff's musculoskeletal complaints, the ALJ noted her lack of ongoing treatment, normal x-rays, and the statement by the nurse practitioner who evaluated Plaintiff and believed that she was malingering.[194] Additionally, the ALJ concluded there was no support for Plaintiff's testimony regarding weakness in her shoulder and arm, because contrary to her testimony and statements to multiple physicians, the record does not support that she underwent a mastectomy or removal of her milk glands.[195] Moreover, following the surgery on her rotator cuff, Plaintiff had full strength in the shoulder and right upper extremity and was advised to continue activities with no restrictions by September 2014, only three months after the procedure.[196]

Although Plaintiff saw a rheumatologist in 2013 for purported disabling back and joint pain, an examination found no joint swelling, normal motor function, and no

---

[193] D.I. 4-2 at 42.
[194] *Id.*
[195] *Id.*
[196] *Id.*

effusion, tenderness or crepitus in her knees.[197]  Plaintiff has never pursued consistent treatment for her alleged impairments.  She has not returned to her rheumatologist since 2014, nor has she sought an evaluation with an orthopedist or surgeon for her back.[198]

Although Plaintiff was examined by a pulmonologist for shortness of breath and coughing, her pulmonary function test and stress test were normal, her chest x-ray was negative, and her symptoms improved with Flonase and were attributed to allergies.[199]  While a sleep study revealed Plaintiff had mild obstructive sleep apnea, the ALJ noted there was no support in the record from her pulmonologist or a cardiologist for Plaintiff's testimony that she falls asleep from a "heart condition."[200]

Additionally, regarding Plaintiff's mental impairments, the ALJ noted there was minimal treatment in the record to support the intensity of symptoms she alleged.  Plaintiff was treated with Prozac and Vistaril for anxiety and depression while incarcerated, but few symptoms or mental status findings are documented in the prison records.[201]  Moreover, the ALJ commented on the nature of Plaintiff's therapist Ms. Wechsler's session notes, which were unusually emotional and sympathetic to Plaintiff's history and claims of innocence.[202]  The record shows that Plaintiff was only treated by Ms. Wechsler from 2010 until 2012.[203]  As a result, the ALJ's conclusion that the

---

[197] *Id.* at 42-43.
[198] *Id.* at 45.
[199] *Id.* at 43.
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*

absence of any documented symptoms, mental status findings, or any indication of how Plaintiff's mental impairments were being addressed is supported.

The ALJ concluded there was nothing in the record to support Ms. Wechsler's opinion about Plaintiff's limitations in performing certain work activities from her March 2015 questionnaire.[204]  The ALJ reasoned that there was "no objective mental status abnormalities documented to justify the severe limitations indicated."[205]  Furthermore, Plaintiff stopped working long before her treatment with Ms. Wechsler, and there is no indication in the session notes that Plaintiff discussed her work history or difficulties on the job.

The ALJ found that the record does not support Plaintiff's testimony regarding her problems with sleep apnea, concentration, or any alleged "disabling mental impairments."[206]  The absence of mental status abnormalities or neurological deficits in the record supports the ALJ's findings.

Further, Plaintiff was scheduled for consultative examinations ("CEs") with a psychiatrist and a psychologist after her hearing to rectify the lack of evidence of her mental impairments.[207]  Plaintiff, however, failed to attend the scheduled CEs.  Thus, the ALJ concluded that the record does not support any additional limitations other than her RFC for unskilled work.[208]

Lastly, the ALJ explained the weight he accorded the March 2015 RFC

---

[204] *See supra* Part II (A)(2)
[205] D.I. 4-2 at 44.
[206] *Id.*
[207] *Id.*
[208] *Id.*

33

questionnaire by Dr. Manifold and the State Agency physical assessment.[209]  The ALJ agreed with Dr. Manifold's opinion about Plaintiff's ability to sit, stand, and walk without limitation; however, the ALJ found a limitation to six hours of combined standing and walking would accommodate Plaintiff's complaints.[210]  The ALJ found that the objective medical evidence did not support Dr. Manifold's opinion regarding lifting, carrying and the manipulative and postural limitations.[211]  He noted that when Plaintiff last saw Dr. Manifold, three months before the questionnaire was completed, she exhibited normal strength and had no activity restrictions.[212]  Concerning the State Agency assessment, the ALJ gave little weight to its determination that Plaintiff had the capacity for light work, but agreed to the finding of her capacity for standing and walking six hours a day with non-exertional limitations.[213]

In sum, the ALJ thoroughly explained the weight he accorded to the medical opinion evidence and his reasons.  Physician reports are afforded controlling weight when the source's opinion on an individual's impairment is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial record evidence.[214]  Here, the ALJ properly established that the opinions he gave little weight to in his determination were unsupported by the objective medical evidence.  Therefore, the ALJ applied the correct legal standards and did not err in his determination that Plaintiff retains the RFC to perform unskilled, medium work.

---

[209] *Id.* at 46.
[210] *Id.*
[211] *See supra* Part II (A)(1).
[212] D.I. 4-2 at 46.
[213] *See supra* Part II (A)(3).
[214] *See supra* Part III (C)(2)

### 3. Factors in Evaluating Credibility

As required by the regulations, the ALJ's decision clearly explained, and provided sufficiently specific reasons based on the record, the weight afforded to Plaintiff's statements.[215]  The ALJ reasonably gave Plaintiff's testimony little weight, as many of her statements were contradicted by the objective record evidence.  The record, as a whole, supported his finding that Plaintiff was not credible.

The ALJ recognized that being a convicted sex offender, who had been incarcerated, placed on supervised parole, and recently under house arrest, likely interferes with her ability to find work and provides motivation for her to exaggerate her symptoms.[216]  Plaintiff's credibility was further damaged when she lied to agents of the court regarding why she missed a Consultative Examination.[217]  The ALJ also determined that she was untruthful as further evidenced by her unsupported allegations of an assault by her parole officer, blaming a minor child for false accusations, and her statement to her therapist that she was being "abused by the very departments that claim to protect[.]"[218]

Regarding her alleged functional limitations, the ALJ noted several inconsistencies in Plaintiff's testimony and the record evidence.  He found that her claims of problems with concentration, persistence, and pace were contradicted by the evidence showing she engages in daily bicycle riding, drives a car, and cares for 20

---

[215] *See supra* Part III (C)(6)
[216] D.I. 4-2 at 45.
[217] *Id.*
[218] *Id.* at 45.

stray cats.[219]  In addition, her ability to cook dinner and grocery shop evidence intact

social, mental and physical functioning.[220]

### 4.    The ALJ's Reliance on the Medical-Vocational Grids

Plaintiff argues that the ALJ erred by relying on the Agency's Medical-Vocational

Grids ("the grids")  in the presence of non-exertional limitations, contrary to the Agency's

regulations and Third Circuit precedent.[221]  Alternatively, Plaintiff further contends that

even if the ALJ rejected all non-exertional limitations, he failed to sufficiently explain this

rejection, and therefore, his decision would still be defective.[222]  This court finds that the

ALJ's use of the grids as a framework for determining that Plaintiff is not disabled is

supported by substantial evidence and did not violate the controlling regulations.

Plaintiff's second argument is without merit because, as explained previously, the ALJ

sufficiently explained his basis for discounting any additional limitations.[223]

Plaintiff relies on the Third Circuit decision in *Sykes v. Apfel*[224] for her argument

that the ALJ's exclusive reliance on the grids was error.[225]  This argument is misplaced,

as the facts of that case are distinguishable from the instant matter.  A careful reading of

*Sykes* indicates that in the present matter, the ALJ's reliance on the grids was in fact

proper.

In *Sykes*, the court determined that the ALJ improperly relied on the grids to find

---

[219] *Id.*
[220] *Id.*
[221] D.I. 7 at 1621.
[222] *Id.*
[223] *See supra* Part IV (B)(2)
[224] *Sykes v. Apfel,* 228 F.3d 259 (3d Cir. 2000)
[225] D.I. 7 at 1621.

the plaintiff disabled.[226]  The ALJ made an independent determination, without relying on VE testimony or other evidence, that Sykes's non-exertional limitation of lack of binocular vision did not significantly diminish his RFC.[227]  The court explained that "the only facts established in the grids are of *unskilled* jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels."[228]  Because Sykes had an additional non-exertional limitation, the ALJ's reliance on the grids was in error.[229]

In contrast, here, the ALJ found that Plaintiff was capable of performing medium work, and limited to unskilled work.  Thus, the ALJ reasonably concluded that Plaintiff was not disabled by using the grids to find there are a significant number of unskilled jobs that exist in the national economy which Plaintiff could perform based on her vocational profile.  Although, the ALJ did not reference the VE testimony in his decision, this testimony and her opinions support the ALJ's determination.[230]  Therefore, substantial evidence supports the ALJ's use of the grids as a framework for finding Plaintiff not disabled.

## V.    CONCLUSION

For the reasons contained herein, I recommend that:

1.  Plaintiff's motion for summary judgment (D.I. 6) be denied.

---

[226] *Sykes*, 228 F.3d at 261.
[227] *Id.* at 274.
[228] *Id.* at 269 (emphasis added).
[229] *Id.* at 261.
[230] *See supra* Part II (B)(2)

2.  Defendant's motion for summary judgment (D.I. 8) be granted.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation, limited to ten pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov

Date: June 21, 2018                          /s/ Mary Pat Thynge
                                             Chief U. S. Magistrate Judge